## J. W. RINGROSE CO. v. W. & J. SLOANE.

(Circuit Court of Appeals, Third Circuit.  April 22, 1921.)

No. 2610.

1. **Contracts ⚮176(1)—Construction held question for court.**

  Where a contract contains no ambiguous expressions or technical words calling for the aid of parol evidence to explain, and of a jury to determine, their meaning, its construction is for the court.

2. **Contracts ⚮202(2)—Agreement by manufacturer to "afford protection of 10 per cent." to customer construed.**

  A provision in a contract relating to the manufacture by defendant for plaintiff of horse blanket linings, that, if asked to quote prices to outside parties other than the government, the manufacturer would "afford us a protection of 10 per cent. to your cost to us as a profit," only required defendant to quote other parties prices 10 per cent. higher than those quoted plaintiff, and did not entitle plaintiff to 10 per cent. of the selling price on sales by defendant to other parties.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by. the J. W. Ringrose Company against W. & J. Sloane. Judgment for defendant (266 Fed. 402), and plaintiff brings error. Affirmed.

See, also, 262 Fed. 545.

Bell, Kendrick, Trinkle & Deeter, of Philadelphia, Pa. (Paxson Deeter, of Philadelphia, Pa., of counsel), for plaintiff in error.

Selden Bacon, of New York City, and Francis B. Bracken, of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and RELLSTAB, District Judge.

WOOLLEY, Circuit Judge.  In this action of assumpsit the plaintiff declared on an oral contract confirmed by correspondence.  The court, regarding the contract as written and wholly embraced within the letters of the parties, entered judgment of nonsuit.  266 Fed. 402. The plaintiff sued out this writ of error.

The facts, shortly stated, are these:

The plaintiff, a Pennsylvania corporation, was a manufacturer of horse blankets; the defendant, a New York corporation, was a jobber dealing in carpets and rugs manufactured by concerns whose output it controlled.

A horse blanket consists of two parts: cover and lining.  Ordinarily, the lining is made of low grade shoddy.  Early in 1918, Lyman, general manager of the plaintiff, realizing that the Government would need large quantities of horse blankets, conceived the idea that blanket linings would be improved by the addition of cattle hair, and could, perhaps, be made on looms used in manufacturing carpets and rugs.  With this in mind, he called upon Gardner, sales agent for the defendant, and, submitting a sample of the proposed lining,—later described as 36″ M.

⚮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

S. Fabric,—discussed with him the feasibility of its manufacture. On being informed that the material could be made at one of the defendant's carpet plants, Lyman discussed with Gardner the matter of marketing the product and came to an agreement with him as to future dealings. As the transaction had, up to this stage, been oral and quite informal, the two representatives of the parties deemed it wise to embody their understanding in writing. Whereupon, they exchanged letters in the names of their principals, written with the object of expressing the entire agreement.

The pertinent part of the letter written by Lyman, under the name of the plaintiff and addressed to the defendant, bearing date March 13, 1918, reads as follows:

"Confirming conversation with your Mr. Gardner over the long distance phone this morning, would say that we understand in the event of your being asked to quote any outside parties on the 36" M. S. Fabric that you would afford us a protection of 10 per cent. to your cost to us, as a profit, with the exception of the Government and in this case it would be wholly dependent upon circumstances. That is to say, should you not be successful in protecting us to the extent of a 10 per cent. profit to the Government, that you would use your own judgment in the matter and offer us what profit it would be possible to get."

On March 14, 1918, Gardner, in the name of the defendant, replied by letter, as follows:

"Acknowledging your favor of the 13th inst., confirming our telephone conversation of yesterday, we agree to protect your interest as suggested in your letter and if any outside parties request quotations we shall be pleased to refer them to you. * * *

"At this time we do not feel that we can make a definite statement as to our position should the Government call upon us direct, but we can assure you that our aim will be to protect your interests if at all possible, as we know and appreciate the amount of missionary work which has been necessary on your part."

Early in April, 1918, the plaintiff, having secured a contract with the Government for horse blankets, bought from the defendant 65,000 yards of 36" M. S. Fabric for linings at 47½ cents per yard. Late in the same month, J. P. Gordon Company asked the defendant for quotations on horse blanket linings. Without referring the inquiry to the plaintiff, the defendant sold the Gordon Company linings of substantially the 36" M. S. Fabric grade at 59 and 61½ cents per yard for the sum of $613,757.01. On learning this, the plaintiff demanded of the defendant 10 per cent. of the price, or 6 cents a yard on the total yardage, as a profit reserved to it under the contract confirmed by the letters quoted. Payment being refused, the plaintiff brought this suit.

The court directed a nonsuit upon several grounds. Although there appears to be substance in all of them, we lay aside those which concern lack of proof of authorization and ratification by the defendant of its agent's acts, lack of mutual obligation and of consideration in the agreement, and come directly to what we regard as the central question in the case, namely, the meaning of the contract, not the one covered by a telephone conversation, but the one which later the representatives of the parties reduced to writing with care and deliberation.

[1] This writing is susceptible of interpretation from its terms. As it contains no ambiguous expressions or technical words calling for the aid of parol evidence to explain and of a jury to determine their meaning (Hamilton Coal Co. v. N. Y. & P. C. & C. Co., 160 Fed. 75, 87 C. C. A. 231), its construction was for the court. We have only to inquire whether the court's construction was right.

[2] The purpose of the writing appears upon its face. It was to meet an impending demand for horse blankets in great quantities. The Federal Government, then at war, would in the main be the ultimate consumer. Each party was free to sell horse blanket linings, either directly or indirectly, to this one great purchaser. Should the defendant sell directly to the Government, it agreed to protect the plaintiff "to the extent of a 10 per cent. profit" if it could; and if it could not, then only to the extent of such profit as "it would be possible to get." But it was further agreed that the defendant should, if it chose, sell linings to "outside parties," that is, to parties other than the plaintiff seeking to sell horse blankets to the Government; on condition, however, that the defendant should, in quoting them prices, "afford us (the plaintiff) a protection of 10 per cent. to your (defendant's) cost to us (the plaintiff), as a profit." By this provision the plaintiff claims an exclusive sales agency of the defendant's linings, and where the defendant sells to "outside parties  *  *  *  with the exception of the Government" it also claims a profit of 10 per cent. on the sales, payment of such profit in the Gordon transaction being now demanded in this suit. The defendant's contention, adopted by the trial court, is that in making quotations to "outside parties," that is, to the plaintiff's competitors, it was obliged to quote them prices 10 per cent. higher than prices quoted the plaintiff, and that in no event, except perhaps on a sale direct to the Government, did it obligate itself to pay the plaintiff anything.

We regard the writing as a contract with reference to jobbers' prices and construe the provision for "protection" to the plaintiff as a promise by a house, being free to sell linings to any one, to quote all others (except the Government) prices 10 per cent. higher than prices it should quote the plaintiff, thereby giving the plaintiff a cost protection or a 10 per cent. business advantage in its competition with others for the sale of the same material, particularly to the one great consumer. This alone was the defendant's obligation in dealing with outsiders other than the Government, and as it kept this obligation in its dealings, we are of opinion that the trial court committed no error in entering judgment of nonsuit.

The judgment below is affirmed.